**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
FT. LAUDERDALE DIVISION
www.flsb.uscourts.gov**

In re:

                                            **Case No.: 10-33696-RBR
Chapter 7 Proceeding**

**GEORGE LEVIN,**

      **Debtor.**

_____/

### CREDITOR, NOVA BANK'S UNOPPOSED MOTION
### FOR RELIEF FROM THE AUTOMATIC STAY

Secured Creditor, NOVA Bank, by and through undersigned counsel, files this Unopposed Motion for Relief From the Automatic Stay, pursuant to 11 U.S.C. § 362(d)(1) and (2) and states:

### Procedural and Factual Background

1.     On August 12, 2010 (the "Petition Date"), the petitioning creditors, Roland G. LaBonte, as Trustee of the Roland G. LaBonte Revocable Trust and Marilyn P. LaBonte, Trustee of the Marilyn P. LaBonte Revocable Trust filed an Involuntary Petition against George Levin under chapter 7 of the Bankruptcy Code.

2.     The Court has not yet entered an Order for Relief in this involuntary case.

3.     No Schedules have been filed yet in this proceeding and George Levin has not yet claimed any property in this proceeding as exempt. No trustee has been appointed.

4.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

### Relationship Between NOVA Bank and George Levin

5.      Prior to the Petition Date, on June 30, 2009, George Levin ("Levin" or the "Debtor") executed and delivered to NOVA Bank, a Promissory Note in the principal amount of $5,000,000.00.  A true and correct copy of the Promissory Note is attached hereto as **Exhibit 1**.

6.      On June 30, 2009, Levin also executed a Business Loan Agreement.  A true and correct copy of the Business Loan Agreement is attached hereto as **Exhibit 2**.

7.      On April 14, 2010, as security for the Obligations[1] by Levin, Levin executed and delivered to NOVA Bank, a Security Agreement, which provided NOVA Bank with a security interest in all of Levin's:

> right, title and interest in and to the following personal property, all whether now owned or hereafter acquired or arising, to wit: the Promissory Note dated as of December 31, 2009 in the original principal amount of $10,000,000.00 executed by Madison House, LP, a limited partnership ("Madison"), in favor of [Levin] (collectively, the "Note") and all renewals, replacements, amendments and modifications to the Note and all cash and non-cash proceeds of all of the foregoing property, all products thereof, and all additions and accessions thereto, substitutions therefor and replacements thereof.

(the "Madison Note").  A true and correct copy of the Security Agreement is attached hereto as **Exhibit 3**.

---

[1] "Obligations" is defined in the Security Agreement to "include, without limitation, all loans, advances, debts, liabilities, obligations, covenants and duties owing to the Bank from the Grantor of any kind of nature, present or future, evidenced by any note, guaranty or other instrument, whether arising by reason of an extension of credit, opening of a letter of credit, loan or guarantee or in any other manner, whether arising out of overdrafts on deposit or other accounts or electronic funds transfers (whether through automatic clearing houses or otherwise) or out of the Bank's non-receipt of or inability to collect funds or otherwise not being made whole in connection with depository transfer check or other similar arrangements, whether direct or indirect (including those acquired by assignment or participation), absolute or contingent, joint or several, due or to become due, now existing or hereafter arising, and any amendments, extensions, renewals or increases and all costs and expenses of the Bank incurred in the documentation, negotiation, modification, enforcement, collection or otherwise in connection with any of the foregoing, including but not limited to reasonable attorneys' fees and expenses.  Notwithstanding the provisions of this subparagraph, Obligations shall not include any loan, debt or obligation pursuant to a Consumer Loan Transaction as defined in the Federal Truth-in-Lending Act and Regulation Z promulgated thereunder."

8.    NOVA Bank is presently in possession of the Promissory Note, the Business Loan Agreement, and the Security Agreement (collectively, the "Loan Documents") and is entitled to all of the rights and remedies provided for therein.

9.    Levin defaulted under the Promissory Note by failing to make all payments required by the Promissory Note. *See* Affidavit of Indebtedness attached hereto as **Exhibit 4**.

10.    Thereafter, the principal balance on the Promissory Note, together with accrued and unpaid interest, became due and owing on July 1, 2010, the maturity date.

11.    Levin failed to pay the principal balance under the Promissory Note, together with accrued and unpaid interest on the maturity date.

12.    On or about August 19, 2010, prior to NOVA Bank becoming aware of the Involuntary Petition, counsel for NOVA Bank sent a demand letter to Levin as a result of his defaults under the Promissory Note.  A true and correct copy of the August 19, 2010 letter is attached hereto as **Exhibit 5**.

13.    The total pre-petition indebtedness on the Petition Date was $5,069,931.09.  *See* Affidavit of Indebtedness, **Exhibit 4**.

14.    The post-petition payment address for NOVA Bank is NOVA Bank, c/o Michael Cosden, Vice President – Special Assets Manager, 30 Elm Avenue, Woodbury Heights, NJ 08097.

### *Equity in the Promissory Note*

15.    Levin does not have any equity in the Madison Note.  The Note executed by Madison House, LP is worth far less than the face amount of $10,000,000.00, as the sole asset of Madison House, LP is worth just a fraction of the debt owed to secured lenders and the stream of

income which allows Madison House to service its debt (if in fact it is fully serving its debt) is going to terminate as of March 31, 2012.

16.    Upon information and belief, the sole asset of Madison House, LP, is real property known as the Madison House Hotel located at 123 South Illinois Ave., Atlantic City, NJ 08401 ("Madison Real Property").

17.    The value of the Madison Real Property as of October 5, 2010 is $3,150,000.00 to $6,300,000.00. A true and correct copy of Prudential's Broker's Price Opinion Madison House is attached hereto as **Exhibit 6**.

18.    The Madison Real Property is subject to a first mortgage in favor of Crown Mortgage Co., as assignee, the principal balance of which, as represented by the promissory notes executed by Madison House and owned by Crown Mortgage Co., is approximately $21,793,000.00. The first mortgage has been collaterally assigned to Susquchania Bank, successor to Minotola National Bank to secure a loan in the principal amount of $3,865,000.00.

19.    Even if Madison House Group LP has been making its scheduled payments under the Promissory Notes with the principal face amount of $21,793,355.06, and secured by the Mortgage on the Madison Real Property, the amount owed is still at least $15,000,000.00. As previously referenced, the Madison Real Property currently has a value of $3,150,000.00 to $6,300,000.00.

20.    As a result, it is clear that the secured debt with respect to the Madison House Property far exceeds the value of the Madison Real Property leaving Madison House Group LP with no equity in the Madison Real Property and no hope to acquire any equity in the near future.

21.    Moreover, upon information and belief, Pinnacle Gaming, currently has a lease with Madison House, LP for the Madison House Hotel which is tied directly to the amount of the

Madison House Hotel's debt service. When Pinnacle Gaming's lease terminates in December 2012, Madison House, LP will have not means of servicing the debt to its lenders.

22.    Given that Madison House Group LP's real property is worth far less than it owes to lenders and its source of income will soon terminate, it is extremely unlikely that Madison House LP will be able to pay $10,000,000.00 on the March 31, 2013 maturity date of the Madison Note. Moreover, there appear to be few, if any assets which could be executed upon to satisfy even a portion of the Madison Note. As result, the Madison Note is worth far less than its face value.

### Relief Requested

23.    NOVA Bank respectfully requests that this Court enter an Order granting NOVA Bank stay relief pursuant to 11 U.S.C. § 362(d)(1) and (2) to proceed *in rem* with all remedies available under applicable non-bankruptcy law including, but not limited to prosecution of a foreclosure action with respect to the Madison Note, sale of the Madison Note or otherwise.

### Cause Exists for Lifting the Automatic Stay
### Pursuant to Section 362(d) of the Bankruptcy Code to
### Allow NOVA Bank to Enforce its Rights as a Secured Creditor

24.    Bankruptcy Code section 362(a) operates as a stay, applicable to all entities of, among other things, (i) commencement of proceedings to recover prepetition claims against the debtor, (ii) acts to obtain possession or exercise control over property of the estate, (iii) acts to enforce a lien against property of the estate, and (iv) acts to recover or collect a claim against the debtor that arose before the commencement of the case. *See, generally,* 11 U.S.C. § 362(a)(1)-(6).

25.    Notwithstanding the foregoing, Bankruptcy Code section 362(d) *mandates* relief from the automatic stay under section 362(a) under the following circumstances:

On request of a party in interest and after notice and a hearing, the court **shall** grant relief from the stay provided under subsection (a) of this section, such as by terminating, annulling, modifying, or condition such stay –

    (1)   for cause, including the lack of adequate protection of an interest in property of such party in interest;

    (2)   with respect to a stay of an act against property under subsection (a) of this section, if –

        (A)   the debtor does not have an equity in such property; and

        (B)   such property is not necessary to an effective reorganization;

11 U.S.C. § 362(d) (emphasis added).

26. As set forth above, relief from stay is mandatory when the proper showing is made. The party requesting relief from stay (in this case, NOVA Bank) has the burden of proof on the issue of Levin's equity in property and the party opposing the relief requested has the burden of proof on all other issues. *See* 11 U.S.C. § 362(g). In this case, relief from stay is mandatory and the automatic stay should be terminated as to the Madison Note to enable NOVA Bank to exercise all of its rights and remedies with respect thereto.

27. Here, NOVA Bank is entitled to relief from the stay (i) for lack of adequate protection of its secured claims and interest in the Madison Note, and (ii) because Levin has no equity interest in the Madison Note and because the Madison Note is not necessary for an effective reorganization.

    A.    The Court Should Grant Relief from the Stay for Cause
        under Section 362(d)(1) of the Bankruptcy Code

28. NOVA Bank is entitled to relief from stay under section 362(d)(1) of the Bankruptcy Code for "cause" because Levin cannot and has not provided NOVA Bank with adequate protection for the continued diminution of NOVA Bank's interests in its collateral.

Thus, for this reason, NOVA Bank respectfully submits that cause exists for lifting the stay under section 362(d)(1).

B.    Relief from Stay is Also Proper Pursuant to
      Section 362(d)(2) of the Bankruptcy Code

29.    As discussed above, section 362(d)(2) of the Bankruptcy Code requires relief from the stay where (i) the debtor does not have equity in the property that is the subject of a request for stay relief and (ii) such property is not necessary to an effective reorganization. 11 U.S.C. § 362(d)(2). Here, both prongs of section 362(d)(2) are easily satisfied.

30.    As an initial matter, the amount owed to NOVA Bank exceeds the value of the Madison Note and, as such, Levin does not have any equity in the Madison Note.

31.    As set forth in detail above, Madison House Group LP's real property is worth a small fraction of the debt it currently owes to its secured lenders and its source of income will be terminating in December, 2012. It is extremely unlikely that Madison House LP will be able to satisfy the $10,000,000.00 Madison Note upon maturity on March 31, 2013. Moreover, there appear to be few, if any, assets which could be executed upon to satisfy even a portion of the Madison Note. As result, the Madison Note is worth far less than its face value, if anything. *See generally Greene v. Newman (In re Newman)*, 11 B.R. 628 (Bankr. S.D.N.Y. 1981)(where a debtor transferred $40,000.00 to a corporation controlled by his children in exchange for a promissory note payable over a period of almost 37 years with interest at seven percent per annum, the court found that the $40,000.00 note by the corporation was not reasonably equivalent value for the cash transfer by the debtor in the amount of $40,000.00.)

32.    Similarly, Levin has no prospects or ability to satisfy its obligations to NOVA Bank and is currently in a chapter 7 involuntary case. As a result, the Madison Note is not necessary to an effective reorganization.

33.    NOVA Bank respectfully requests that the Court waive the ten (10) day stay of the Order Granting Relief pursuant to Bankruptcy Rule 4001(a)(3), so that it can pursue the actions set forth in this motion.

34.    Undersigned counsel has consulted with counsel for Involuntary Debtor George Levin with respect to the requested relief. Counsel for Levin has advised that Levin has no opposition to the relief requested, subject to agreement, as reflected in any Order, that the grant of the requested relief is without waiver of any claims and defenses which Levin may possess against Nova Bank, and has no binding authority with respect to the rights of Madison House Group L.P.

WHEREFORE, NOVA Bank respectfully requests that this Court enter an order granting NOVA Bank relief from the automatic stay pursuant to section 362(d)(1), (2) and (3) of the Bankruptcy Code and Bankruptcy Rules 4001 and 9014 to allow NOVA Bank to enforce all of its rights as a secured creditor of George Levin, whether through prosecution of a foreclosure action against the Madison Note, sale of the Madison Note or otherwise, granting attorneys fees and costs related to this Motion and any hearing thereon and, granting such other and further relief as the Court deems just and proper.

I HEREBY CERTIFY that I am admitted to the Bar of the United States District Court for the Southern District of Florida, and I am in compliance with the additional qualifications to practice in this Court set forth in Local Rule 2090-1(A).

I HEREBY CERTIFY that a true and correct copy of the foregoing has been furnished via CM/ECF and by regular U.S. Mail to all parties on the attached list on this 29th day of November, 2010.

Dated: November 29, 2010

Respectfully submitted,

**FOX ROTHSCHILD LLP**

/s/ Heather L. Ries
Heather L. Ries (Florida Bar No.: 581933)
hries@foxrothschild.com
222 Lakeview Avenue, Suite 700
West Palm Beach, FL 33401
Telephone:  561.835.9600
Facsimile:  561.835.9602

*Attorneys for NOVA Bank*

WP1 343918v3 11/29/10

**Electronic Mail Notice List**

The following is the list of **parties** who are currently on the list to receive e-mail notice/service for this case.

- Paul J McMahon    pjm@pjmlawmiami.com

- Office of the US Trustee    USTPRegion21.MM.ECF@usdoj.gov

- Recovery Management Systems Corp (RS)    claims@recoverycorp.com

- Heather L. Ries    hries@foxrothschild.com, mbird@foxrothschild.com

- Kenneth B Robinson    krobinson.ecf@rprslaw.com

- Martin L Sandler    martin@sandler-sandler.com

`*00000000000000%00000000053801078%0955%06302009*`

# PROMISSORY NOTE

| Principal | Loan Date | Maturity | Loan No | Call / Coll | Account | Officer | Initials |
|---|---|---|---|---|---|---|---|
| $5,000,000.00 | 06-30-2009 | 07-01-2010 | 53801078 | 66 | | 315 | |

References in the boxes above are for Lender's use only and do not limit the applicability of this document to any particular loan or item.
Any item above containing "* * * *" has been omitted due to text length limitations.

**Borrower:**  GEORGE G LEVIN
100 BAY COLONY LANE
FT LAUDERDALE, FL  33308

**Lender:**  NOVA Bank
Loan Operations
18 East Wynnewood Road
Wynnewood, PA  19096
(877) 322-6511

---

**Principal Amount: $5,000,000.00**                                         **Date of Note: June 30, 2009**

**PROMISE TO PAY.** GEORGE G LEVIN ("Borrower") promises to pay to NOVA Bank ("Lender"), or order, in lawful money of the United States of America, the principal amount of Five Million & 00/100 Dollars ($5,000,000.00) or so much as may be outstanding, together with interest on the unpaid outstanding principal balance of each advance. Interest shall be calculated from the date of each advance until repayment of each advance.

**PAYMENT.** Borrower will pay this loan in full immediately upon Lender's demand. If no demand is made, Borrower will pay this loan in one payment of all outstanding principal plus all accrued unpaid interest on July 1, 2010. In addition, Borrower will pay regular monthly payments of all accrued unpaid interest due as of each payment date, beginning August 1, 2009, with all subsequent interest payments to be due on the same day of each month after that. Unless otherwise agreed or required by applicable law, payments will be applied first to any accrued unpaid interest; then to principal; then to any late charges; and then to any unpaid collection costs. Borrower will pay Lender at Lender's address shown above or at such other place as Lender may designate in writing.

**VARIABLE INTEREST RATE.** The interest rate on this Note is subject to change from time to time based on changes in an independent index which is the prime rate as published in the Wall Street Journal; should two rates appear, the higher of the two rates will be used (the "Index"). The Index is not necessarily the lowest rate charged by Lender on its loans. If the Index becomes unavailable during the term of this loan, Lender may designate a substitute index after notifying Borrower. Lender will tell Borrower the current Index rate upon Borrower's request. The interest rate change will not occur more often than each day. Borrower understands that Lender may make loans based on other rates as well. The Index currently is 3.250% per annum. Interest on the unpaid principal balance of this Note will be calculated as described in the "INTEREST CALCULATION METHOD" paragraph using a rate of 1.000 percentage point over the Index, adjusted if necessary for any minimum and maximum rate limitations described below, resulting in an initial rate of 7.000% per annum based on a year of 360 days. NOTICE: Under no circumstances will the interest rate on this Note be less than 7.000% per annum or more than the maximum rate allowed by applicable law.

**INTEREST CALCULATION METHOD.** Interest on this Note is computed on a 365/360 basis; that is, by applying the ratio of the interest rate over a year of 360 days, multiplied by the outstanding principal balance, multiplied by the actual number of days the principal balance is outstanding. All interest payable under this Note is computed using this method.

**PREPAYMENT.** Borrower may pay without penalty all or a portion of the amount owed earlier than it is due. Early payments will not, unless agreed to by Lender in writing, relieve Borrower of Borrower's obligation to continue to make payments of accrued unpaid interest. Rather, early payments will reduce the principal balance due. Borrower agrees not to send Lender payments marked "paid in full", "without recourse", or similar language. If Borrower sends such a payment, Lender may accept it without losing any of Lender's rights under this Note, and Borrower will remain obligated to pay any further amount owed to Lender. All written communications concerning disputed amounts, including any check or other payment instrument that indicates that the payment constitutes "payment in full" of the amount owed or that is tendered with other conditions or limitations or as full satisfaction of a disputed amount must be mailed or delivered to: NOVA Bank, Loan Operations, 18 East Wynnewood Road Wynnewood, PA 19096.

**LATE CHARGE.** If a payment is 11 days or more late, Borrower will be charged 5.000% of the unpaid portion of the regularly scheduled payment or $25.00, whichever is greater.

**INTEREST AFTER DEFAULT.** Upon default, including failure to pay upon final maturity, the interest rate on this Note shall be increased by adding a 5.000 percentage point margin ("Default Rate Margin"). The Default Rate Margin shall also apply to each succeeding interest rate change that would have applied had there been no default. If judgment is entered in connection with this Note, interest will continue to accrue after the date of judgment at the rate in effect at the time that judgment is entered. However, in no event will the interest rate exceed the maximum interest rate limitations under applicable law.

**DEFAULT.** Each of the following shall constitute an event of default ("Event of Default") under this Note:

**Payment Default.** Borrower fails to make any payment when due under this Note.

**Other Defaults.** Borrower fails to comply with or to perform any other term, obligation, covenant or condition contained in this Note or in any of the related documents or to comply with or to perform any term, obligation, covenant or condition contained in any other agreement between Lender and Borrower.

**Default in Favor of Third Parties.** Borrower or any Grantor defaults under any loan, extension of credit, security agreement, purchase or sales agreement, or any other agreement, in favor of any other creditor or person that may materially affect any of Borrower's property or Borrower's ability to repay this Note or perform Borrower's obligations under this Note or any of the related documents.

**False Statements.** Any warranty, representation or statement made or furnished to Lender by Borrower or on Borrower's behalf under this Note or the related documents is false or misleading in any material respect, either now or at the time made or furnished or becomes false or misleading at any time thereafter.

**Death or Insolvency.** The death of Borrower or the dissolution or termination of Borrower's existence as a going business, the insolvency of Borrower, the appointment of a receiver for any part of Borrower's property, any assignment for the benefit of creditors, any type of creditor workout, or the commencement of any proceeding under any bankruptcy or insolvency laws by or against Borrower.

**Creditor or Forfeiture Proceedings.** Commencement of foreclosure or forfeiture proceedings, whether by judicial proceeding, self-help, repossession or any other method, by any creditor of Borrower or by any governmental agency against any collateral securing the loan,

PENGAD 800-631-6989

EXHIBIT

1

**PROMISSORY NOTE**
**(Continued)**

This includes a garnishment of any of Borrower's accounts, including deposit accounts, with Lender. However, this Event of Default shall not apply if there is a good faith dispute by Borrower as to the validity or reasonableness of the claim which is the basis of the creditor or forfeiture proceeding and if Borrower gives Lender written notice of the creditor or forfeiture proceeding and deposits with Lender monies or a surety bond for the creditor or forfeiture proceeding, in an amount determined by Lender, in its sole discretion, as being an adequate reserve or bond for the dispute.

**Events Affecting Guarantor.** Any of the preceding events occurs with respect to any guarantor, endorser, surety, or accommodation party of any of the indebtedness or any guarantor, endorser, surety, or accommodation party dies or becomes incompetent, or revokes or disputes the validity of, or liability under, any guaranty of the indebtedness evidenced by this Note.

**Adverse Change.** A material adverse change occurs in Borrower's financial condition, or Lender believes the prospect of payment or performance of this Note is impaired.

**Insecurity.** Lender in good faith believes itself insecure.

**Cure Provisions.** If any default, other than a default in payment is curable and if Borrower has not been given a notice of a breach of the same provision of this Note within the preceding twelve (12) months, it may be cured if Borrower, after Lender sends written notice to Borrower demanding cure of such default: (1) cures the default within ten (10) days; or (2) if the cure requires more than ten (10) days, immediately initiates steps which Lender deems in Lender's sole discretion to be sufficient to cure the default and thereafter continues and completes all reasonable and necessary steps sufficient to produce compliance as soon as reasonably practical.

**LENDER'S RIGHTS.** Upon default, Lender may, after giving such notices as required by applicable law, declare the entire unpaid principal balance under this Note and all accrued unpaid interest immediately due, and then Borrower will pay that amount.

**ATTORNEYS' FEES; EXPENSES.** Lender may hire or pay someone else to help collect this Note if Borrower does not pay. Borrower will pay Lender that amount. This includes, subject to any limits under applicable law, Lender's reasonable attorneys' fees and Lender's legal expenses, whether or not there is a lawsuit, including reasonable attorneys' fees, expenses for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), and appeals. If not prohibited by applicable law, Borrower also will pay any court costs, in addition to all other sums provided by law.

**JURY WAIVER.** Lender and Borrower hereby waive the right to any jury trial in any action, proceeding, or counterclaim brought by either Lender or Borrower against the other.

**GOVERNING LAW. This Note will be governed by federal law applicable to Lender and, to the extent not preempted by federal law, the laws of the Commonwealth of Pennsylvania without regard to its conflicts of law provisions. This Note has been accepted by Lender in the Commonwealth of Pennsylvania.**

**CHOICE OF VENUE.** If there is a lawsuit, Borrower agrees upon Lender's request to submit to the jurisdiction of the courts of Montgomery County, Commonwealth of Pennsylvania.

**DISHONORED ITEM FEE.** Borrower will pay a fee to Lender of $30.00 if Borrower makes a payment on Borrower's loan and the check or preauthorized charge with which Borrower pays is later dishonored.

**RIGHT OF SETOFF.** To the extent permitted by applicable law, Lender reserves a right of setoff in all Borrower's accounts with Lender (whether checking, savings, or some other account). This includes all accounts Borrower holds jointly with someone else and all accounts Borrower may open in the future. However, this does not include any IRA or Keogh accounts, or any trust accounts for which setoff would be prohibited by law. Borrower authorizes Lender, to the extent permitted by applicable law, to charge or setoff all sums owing on the debt against any and all such accounts, and, at Lender's option, to administratively freeze all such accounts to allow Lender to protect Lender's charge and setoff rights provided in this paragraph.

**COLLATERAL.** This loan is unsecured.

**LINE OF CREDIT.** This Note evidences a revolving line of credit. Advances under this Note may be requested orally by Borrower or as provided in this paragraph. All oral requests shall be confirmed in writing on the day of the request. All communications, instructions, or directions by telephone or otherwise to Lender are to be directed to Lender's office shown above. The following person or persons are authorized to request advances and authorize payments under the line of credit until Lender receives from Borrower, at Lender's address shown above, written notice of revocation of such authority: GEORGE G LEVIN, individually. Borrower agrees to be liable for all sums either: (A) advanced in accordance with the instructions of an authorized person or (B) credited to any of Borrower's accounts with Lender. The unpaid principal balance owing on this Note at any time may be evidenced by endorsements on this Note or by Lender's internal records, including daily computer print-outs.

**SUCCESSOR INTERESTS.** The terms of this Note shall be binding upon Borrower, and upon Borrower's heirs, personal representatives, successors and assigns, and shall inure to the benefit of Lender and its successors and assigns.

**NOTIFY US OF INACCURATE INFORMATION WE REPORT TO CONSUMER REPORTING AGENCIES.** Please notify us if we report any inaccurate information about your account(s) to a consumer reporting agency. Your written notice describing the specific inaccuracy(ies) should be sent to us at the following address: NOVA Bank Loan Operations 18 East Wynnewood Road Wynnewood, PA 19096.

**GENERAL PROVISIONS.** This Note is payable on demand. The inclusion of specific default provisions or rights of Lender shall not preclude Lender's right to declare payment of this Note on its demand. If any part of this Note cannot be enforced, this fact will not affect the rest of the Note. Lender may delay or forgo enforcing any of its rights or remedies under this Note without losing them. Borrower and any other person who signs, guarantees or endorses this Note, to the extent allowed by law, waive presentment, demand for payment, and notice of dishonor. Upon any change in the terms of this Note, and unless otherwise expressly stated in writing, no party who signs this Note, whether as maker, guarantor, accommodation maker or endorser, shall be released from liability. All such parties agree that Lender may renew or extend (repeatedly and for any length of time) this loan or release any party or guarantor or collateral; or impair, fail to realize upon or perfect Lender's security interest in the collateral; and take any other action deemed necessary by Lender without the consent of or notice to anyone. All such parties also agree that Lender may modify this loan without the consent of or notice to anyone other than the party with whom the modification is made. The obligations under this Note are joint and several.

# PROMISSORY NOTE
## (Continued)

Loan No: 5380107B

Page 3

PRIOR TO SIGNING THIS NOTE, BORROWER READ AND UNDERSTOOD ALL THE PROVISIONS OF THIS NOTE, INCLUDING THE VARIABLE INTEREST RATE PROVISIONS. BORROWER AGREES TO THE TERMS OF THE NOTE.

BORROWER ACKNOWLEDGES RECEIPT OF A COMPLETED COPY OF THIS PROMISSORY NOTE.

THIS NOTE IS GIVEN UNDER SEAL AND IT IS INTENDED THAT THIS NOTE IS AND SHALL CONSTITUTE AND HAVE THE EFFECT OF A SEALED INSTRUMENT ACCORDING TO LAW.

BORROWER:

X_____(Seal)
GEORGE G LEVIN

LENDER:

NOVA BANK

X_____
Thomas J Patterson, Senior Vice President

LASER PRO Lending, Ver. 5.49.00.004  Copr. Harland Financial Solutions, Inc. 1997, 2008.  All Rights Reserved.  - PA  Q:\CFNLA\D30.FC  TR-3804  PR-117





*000000000000000%00000000053801078%0070%06302009*

# BUSINESS LOAN AGREEMENT

| Principal | Loan Date | Maturity | Loan No | Call / Coll | Account | Officer | Initials |
|---|---|---|---|---|---|---|---|
| $5,000,000.00 | 06-30-2009 | 07-01-2010 | 53801078 | 66 | | 315 | |

References in the boxes above are for Lender's use only and do not limit the applicability of this document to any particular loan or item.
Any item above containing " **** " has been omitted due to text length limitations.

**Borrower:** GEORGE G LEVIN
100 BAY COLONY LANE
FT LAUDERDALE, FL 33308

**Lender:** NOVA Bank
Loan Operations
18 East Wynnewood Road
Wynnewood, PA 19096
(877) 322-6511

---

THIS BUSINESS LOAN AGREEMENT dated June 30, 2009, is made and executed between GEORGE G LEVIN ("Borrower") and NOVA Bank ("Lender") on the following terms and conditions. Borrower has received prior commercial loans from Lender or has applied to Lender for a commercial loan or loans or other financial accommodations, including those which may be described on any exhibit or schedule attached to this Agreement. Borrower understands and agrees that: (A) in granting, renewing, or extending any Loan, Lender is relying upon Borrower's representations, warranties, and agreements as set forth in this Agreement; (B) the granting, renewing, or extending of any Loan by Lender at all times shall be subject to Lender's sole judgment and discretion; and (C) all such Loans shall be and remain subject to the terms and conditions of this Agreement.

**TERM.** This Agreement shall be effective as of June 30, 2009, and shall continue in full force and effect until such time as all of Borrower's Loans in favor of Lender have been paid in full, including principal, interest, costs, expenses, attorneys' fees, and other fees and charges, or until such time as the parties may agree in writing to terminate this Agreement.

**ADVANCE AUTHORITY.** The following person or persons are authorized to request advances and authorize payments under the line of credit until Lender receives from Borrower, at Lender's address shown above, written notice of revocation of such authority: GEORGE G LEVIN, Individually.

**CONDITIONS PRECEDENT TO EACH ADVANCE.** Lender's obligation to make the initial Advance and each subsequent Advance under this Agreement shall be subject to the fulfillment to Lender's satisfaction of all of the conditions set forth in this Agreement and in the Related Documents.

**Loan Documents.** Borrower shall provide to Lender the following documents for the Loan: (1) the Note; (2) together with all such Related Documents as Lender may require for the Loan; all in form and substance satisfactory to Lender and Lender's counsel.

**Payment of Fees and Expenses.** Borrower shall have paid to Lender all fees, charges, and other expenses which are then due and payable as specified in this Agreement or any Related Document.

**Representations and Warranties.** The representations and warranties set forth in this Agreement, in the Related Documents, and in any document or certificate delivered to Lender under this Agreement are true and correct.

**No Event of Default.** There shall not exist at the time of any Advance a condition which would constitute an Event of Default under this Agreement or under any Related Document.

**REPRESENTATIONS AND WARRANTIES.** Borrower represents and warrants to Lender, as of the date of this Agreement, as of the date of each disbursement of loan proceeds, as of the date of any renewal, extension or modification of any Loan, and at all times any Indebtedness exists:

**Business Activities.** Borrower maintains an office at 100 BAY COLONY LANE, FT LAUDERDALE, FL 33308. Unless Borrower has designated otherwise in writing, the principal office is the office at which Borrower keeps its books and records including its records concerning the Collateral. Borrower will notify Lender prior to any change in the location of Borrower's principal office address or any change in Borrower's name. Borrower shall do all things necessary to comply with all regulations, rules, ordinances, statutes, orders and decrees of any governmental or quasi-governmental authority or court applicable to Borrower or to Borrower's business activities.

**Assumed Business Names.** Borrower has filed or recorded all documents or filings required by law relating to all assumed business names used by Borrower. Excluding the name of Borrower, the following is a complete list of all assumed business names under which Borrower does business: None.

**Authorization.** Borrower's execution, delivery, and performance of this Agreement and all the Related Documents do not conflict with, result in a violation of, or constitute a default under (1) any provision of any agreement or other instrument binding upon Borrower or (2) any law, governmental regulation, court decree, or order applicable to Borrower or to Borrower's properties.

**Financial Information.** Each of Borrower's financial statements supplied to Lender truly and completely disclosed Borrower's financial condition as of the date of the statement, and there has been no material adverse change in Borrower's financial condition subsequent to the date of the most recent financial statement supplied to Lender. Borrower has no material contingent obligations except as disclosed in such financial statements.

**Legal Effect.** This Agreement constitutes, and any instrument or agreement Borrower is required to give under this Agreement when delivered will constitute legal, valid, and binding obligations of Borrower enforceable against Borrower in accordance with their respective terms.

**Properties.** Except as contemplated by this Agreement or as previously disclosed in Borrower's financial statements or in writing to Lender and as accepted by Lender, and except for property tax liens for taxes not presently due and payable, Borrower owns and has good title to all of Borrower's properties free and clear of all Security Interests, and has not executed any security documents or financing statements relating to such properties. All of Borrower's properties are titled in Borrower's legal name, and Borrower has not used or filed a financing statement under any other name for at least the last five (5) years.

**Hazardous Substances.** Except as disclosed to and acknowledged by Lender in writing, Borrower represents and warrants that: (1) During the period of Borrower's ownership of the Collateral, there has been no use, generation, manufacture, storage, treatment, disposal, release or threatened release of any Hazardous Substance by any person on, under, about or from any of the Collateral. (2) Borrower has no knowledge of, or reason to believe that there has been (a) any breach or violation of any Environmental Laws; (b) any use, generation,

EXHIBIT
2

PENGUIN 800-631-6989

# BUSINESS LOAN AGREEMENT
## (Continued)

manufacture, storage, treatment, disposal, release or threatened release of any Hazardous Substance on, under, about or from the Collateral by any prior owners or occupants of any of the Collateral; or (c) any actual or threatened litigation or claims of any kind by any person relating to such matters. (3) Neither Borrower nor any tenant, contractor, agent or other authorized user of any of the Collateral shall use, generate, manufacture, store, treat, dispose of or release any Hazardous Substance on, under, about or from any of the Collateral; and any such activity shall be conducted in compliance with all applicable federal, state, and local laws, regulations, and ordinances, including without limitation all Environmental Laws. Borrower authorizes Lender and its agents to enter upon the Collateral to make such inspections and tests as Lender may deem appropriate to determine compliance of the Collateral with this section of the Agreement. Any inspections or tests made by Lender shall be at Borrower's expense and for Lender's purposes only and shall not be construed to create any responsibility or liability on the part of Lender to Borrower or to any other person. The representations and warranties contained herein are based on Borrower's due diligence in investigating the Collateral for hazardous waste and Hazardous Substances. Borrower hereby (1) releases and waives any future claims against Lender for indemnity or contribution in the event Borrower becomes liable for cleanup or other costs under any such laws, and (2) agrees to indemnify, defend, and hold harmless Lender against any and all claims, losses, liabilities, damages, penalties, and expenses which Lender may directly or indirectly sustain or suffer resulting from a breach of this section of the Agreement or as a consequence of any use, generation, manufacture, storage, disposal, release or threatened release of a hazardous waste or substance on the Collateral. The provisions of this section of the Agreement, including the obligation to indemnify and defend, shall survive the payment of the Indebtedness and the termination, expiration or satisfaction of this Agreement and shall not be affected by Lender's acquisition of any interest in any of the Collateral, whether by foreclosure or otherwise.

**Litigation and Claims.** No litigation, claim, investigation, administrative proceeding or similar action (including those for unpaid taxes) against Borrower is pending or threatened, and no other event has occurred which may materially adversely affect Borrower's financial condition or properties, other than litigation, claims, or other events, if any, that have been disclosed to and acknowledged by Lender in writing.

**Taxes.** To the best of Borrower's knowledge, all of Borrower's tax returns and reports that are or were required to be filed, have been filed, and all taxes, assessments and other governmental charges have been paid in full, except those presently being or to be contested by Borrower in good faith in the ordinary course of business and for which adequate reserves have been provided.

**Lien Priority.** Unless otherwise previously disclosed to Lender in writing, Borrower has not entered into or granted any Security Agreements, or permitted the filing or attachment of any Security Interests on or affecting any of the Collateral directly or indirectly securing repayment of Borrower's Loan and Note, that would be prior or that may in any way be superior to Lender's Security Interests and rights in and to such Collateral.

**Binding Effect.** This Agreement, the Note, all Security Agreements (if any), and all Related Documents are binding upon the signers thereof, as well as upon their successors, representatives and assigns, and are legally enforceable in accordance with their respective terms.

**AFFIRMATIVE COVENANTS.** Borrower covenants and agrees with Lender that, so long as this Agreement remains in effect, Borrower will:

**Notices of Claims and Litigation.** Promptly inform Lender in writing of (1) all material adverse changes in Borrower's financial condition, and (2) all existing and all threatened litigation, claims, investigations, administrative proceedings or similar actions affecting Borrower or any Guarantor which could materially affect the financial condition of Borrower or the financial condition of any Guarantor.

**Financial Records.** Maintain its books and records in accordance with GAAP, applied on a consistent basis, and permit Lender to examine and audit Borrower's books and records at all reasonable times.

**Financial Statements.** Furnish Lender with the following:

**Annual Statements.** As soon as available, but in no event later than one-hundred-twenty (120) days after the end of each fiscal year, Borrower's balance sheet and income statement for the year ended, prepared by Borrower in form satisfactory to Lender.

**Tax Returns.** As soon as available, but in no event later than thirty (30) days after the applicable filing date for the tax reporting period ended, Federal and other governmental tax returns, prepared by a tax professional satisfactory to Lender.

All financial reports required to be provided under this Agreement shall be prepared in accordance with GAAP, applied on a consistent basis, and certified by Borrower as being true and correct.

**Additional Information.** Furnish such additional information and statements, as Lender may request from time to time.

**Insurance.** Maintain fire and other risk insurance, public liability insurance, and such other insurance as Lender may require with respect to Borrower's properties and operations, in form, amounts, coverages and with insurance companies acceptable to Lender. Borrower, upon request of Lender, will deliver to Lender from time to time the policies or certificates of insurance in form satisfactory to Lender, including stipulations that coverages will not be cancelled or diminished without at least thirty (30) days prior written notice to Lender. Each insurance policy also shall include an endorsement providing that coverage in favor of Lender will not be impaired in any way by any act, omission or default of Borrower or any other person. In connection with all policies covering assets in which Lender holds or is offered a security interest for the Loans, Borrower will provide Lender with such lender's loss payable or other endorsements as Lender may require.

**Insurance Reports.** Furnish to Lender, upon request of Lender, reports on each existing insurance policy showing such information as Lender may reasonably request, including without limitation the following: (1) the name of the insurer; (2) the risks insured; (3) the amount of the policy; (4) the properties insured; (5) the then current property values on the basis of which insurance has been obtained, and the manner of determining those values; and (6) the expiration date of the policy. In addition, upon request of Lender (however not more often than annually), Borrower will have an independent appraiser satisfactory to Lender determine, as applicable, the actual cash value or replacement cost of any Collateral. The cost of such appraisal shall be paid by Borrower.

**Other Agreements.** Comply with all terms and conditions of all other agreements, whether now or hereafter existing, between Borrower and any other party and notify Lender immediately in writing of any default in connection with any other such agreements.

**Loan Proceeds.** Use all Loan proceeds solely for Borrower's business operations, unless specifically consented to the contrary by Lender in writing.

**Taxes, Charges and Liens.** Pay and discharge when due all of its indebtedness and obligations, including without limitation all assessments, taxes, governmental charges, levies and liens, of every kind and nature, imposed upon Borrower or its properties, income, or profits, prior to the date on which penalties would attach, and all lawful claims that, if unpaid, might become a lien or charge upon any of Borrower's properties, income, or profits. Provided however, Borrower will not be required to pay and discharge any such assessment, tax, charge, levy, lien or claim so long as (1) the legality of the same shall be contested in good faith by appropriate proceedings, and (2) Borrower shall have established on Borrower's books adequate reserves with respect to such contested assessment, tax, charge, levy, lien, or claim in accordance with GAAP.

## BUSINESS LOAN AGREEMENT

**Performance.** Perform and comply, in a timely manner, with all terms, conditions, and provisions set forth in this Agreement, in the Related Documents, and in all other instruments and agreements between Borrower and Lender. Borrower shall notify Lender immediately in writing of any default in connection with any agreement.

**Operations.** Maintain executive and management personnel with substantially the same qualifications and experience as the present executive and management personnel; provide written notice to Lender of any change in executive and management personnel; conduct its business affairs in a reasonable and prudent manner.

**Environmental Studies.** Promptly conduct and complete, at Borrower's expense, all such investigations, studies, samplings and testings as may be requested by Lender or any governmental authority relative to any substance, or any waste or by-product of any substance defined as toxic or a hazardous substance under applicable federal, state, or local law, rule, regulation, order or directive, at or affecting any property or any facility owned, leased or used by Borrower.

**Compliance with Governmental Requirements.** Comply with all laws, ordinances, and regulations, now or hereafter in effect, of all governmental authorities applicable to the conduct of Borrower's properties, businesses and operations, and to the use or occupancy of the Collateral, including without limitation, the Americans With Disabilities Act. Borrower may contest in good faith any such law, ordinance, or regulation and withhold compliance during any proceeding, including appropriate appeals, so long as Borrower has notified Lender in writing prior to doing so and so long as, in Lender's sole opinion, Lender's interests in the Collateral are not jeopardized. Lender may require Borrower to post adequate security or a surety bond, reasonably satisfactory to Lender, to protect Lender's interest.

**Inspection.** Permit employees or agents of Lender at any reasonable time to inspect any and all Collateral for the Loan or Loans and Borrower's other properties and to examine or audit Borrower's books, accounts, and records and to make copies and memoranda of Borrower's books, accounts, and records. If Borrower now or at any time hereafter maintains any records (including without limitation computer generated records and computer software programs for the generation of such records) in the possession of a third party, Borrower, upon request of Lender, shall notify such party to permit Lender free access to such records at all reasonable times and to provide Lender with copies of any records it may request, all at Borrower's expense.

**Environmental Compliance and Reports.** Borrower shall comply in all respects with any and all Environmental Laws; not cause or permit to exist, as a result of an intentional or unintentional action or omission on Borrower's part or on the part of any third party, on property owned and/or occupied by Borrower, any environmental activity where damage may result to the environment, unless such environmental activity is pursuant to and in compliance with the conditions of a permit issued by the appropriate federal, state or local governmental authorities; shall furnish to Lender promptly and in any event within thirty (30) days after receipt thereof a copy of any notice, summons, lien, citation, directive, letter or other communication from any governmental agency or instrumentality concerning any intentional or unintentional action or omission on Borrower's part in connection with any environmental activity whether or not there is damage to the environment and/or other natural resources.

**Additional Assurances.** Make, execute and deliver to Lender such promissory notes, mortgages, deeds of trust, security agreements, assignments, financing statements, instruments, documents and other agreements as Lender or its attorneys may reasonably request to evidence and secure the Loans and to perfect all Security Interests.

**RECOVERY OF ADDITIONAL COSTS.** If the imposition of or any change in any law, rule, regulation or guideline, or the interpretation or application of any thereof by any court or administrative or governmental authority (including any request or policy not having the force of law) shall impose, modify or make applicable any taxes (except federal, state or local income or franchise taxes imposed on Lender), reserve requirements, capital adequacy requirements or other obligations which would (A) increase the cost to Lender for extending or maintaining the credit facilities to which this Agreement relates, (B) reduce the amounts payable to Lender under this Agreement or the Related Documents, or (C) reduce the rate of return on Lender's capital as a consequence of Lender's obligations with respect to the credit facilities to which this Agreement relates, then Borrower agrees to pay Lender such additional amounts as will compensate Lender therefor, within five (5) days after Lender's written demand for such payment, which demand shall be accompanied by an explanation of such imposition or charge and a calculation in reasonable detail of the additional amounts payable by Borrower, which explanation and calculations shall be conclusive in the absence of manifest error.

**LENDER'S EXPENDITURES.** If any action or proceeding is commenced that would materially affect Lender's interest in the Collateral or if Borrower fails to comply with any provision of this Agreement or any Related Documents, including but not limited to Borrower's failure to discharge or pay when due any amounts Borrower is required to discharge or pay under this Agreement or any Related Documents, Lender on Borrower's behalf may (but shall not be obligated to) take any action that Lender deems appropriate, including but not limited to discharging or paying all taxes, liens, security interests, encumbrances and other claims, at any time levied or placed on any Collateral and paying all costs for insuring, maintaining and preserving any Collateral. All such expenditures incurred or paid by Lender for such purposes will then bear interest at the rate charged under the Note from the date incurred or paid by Lender to the date of repayment by Borrower. All such expenses will become a part of the Indebtedness and, at Lender's option, will (A) be payable on demand; (B) be added to the balance of the Note and be apportioned among and be payable with any installment payments to become due during either (1) the term of any applicable insurance policy; or (2) the remaining term of the Note; or (C) be treated as a balloon payment which will be due and payable at the Note's maturity.

**NEGATIVE COVENANTS.** Borrower covenants and agrees with Lender that while this Agreement is in effect, Borrower shall not, without the prior written consent of Lender:

**Indebtedness and Liens.** (1) Except for trade debt incurred in the normal course of business and indebtedness to Lender contemplated by this Agreement, create, incur or assume indebtedness for borrowed money, including capital leases, (2) sell, transfer, mortgage, assign, pledge, lease, grant a security interest in, or encumber any of Borrower's assets (except as allowed as Permitted Liens), or (3) sell with recourse any of Borrower's accounts, except to Lender.

**Continuity of Operations.** (1) Engage in any business activities substantially different than those in which Borrower is presently engaged, or (2) cease operations, liquidate, merge, transfer, acquire or consolidate with any other entity, change ownership, dissolve or transfer or sell Collateral out of the ordinary course of business.

**Loans, Acquisitions and Guaranties.** (1) Loan, invest in or advance money or assets to any other person, enterprise or entity, (2) purchase, create or acquire any interest in any other enterprise or entity, or (3) incur any obligation as surety or guarantor other than in the ordinary course of business.

**Agreements.** Borrower will not enter into any agreement containing any provisions which would be violated or breached by the performance of Borrower's obligations under this Agreement or in connection herewith.

**CESSATION OF ADVANCES.** If Lender has made any commitment to make any Loan to Borrower, whether under this Agreement or under any other agreement, Lender shall have no obligation to make any Loan Advances or to disburse Loan proceeds if: (A) Borrower or any Guarantor is in default under the terms of this Agreement or any of the Related Documents or any other agreement that Borrower or any Guarantor has with Lender; (B) Borrower or any Guarantor dies, becomes incompetent or becomes insolvent, files a petition in bankruptcy or similar proceedings,

## BUSINESS LOAN AGREEMENT

or is adjudged a bankrupt; (C) there occurs a material adverse change in Borrower's financial condition, in the financial condition of any Guarantor, or in the value of any Collateral securing any Loan; or (D) any Guarantor seeks, claims or otherwise attempts to limit, modify or revoke such Guarantor's guaranty of the Loan or any other loan with Lender; or (E) Lender in good faith deems itself insecure, even though no Event of Default shall have occurred.

**RIGHT OF SETOFF.** To the extent permitted by applicable law, Lender reserves a right of setoff in all Borrower's accounts with Lender (whether checking, savings, or some other account). This includes all accounts Borrower holds jointly with someone else and all accounts Borrower may open in the future. However, this does not include any IRA or Keogh accounts, or any trust accounts for which setoff would be prohibited by law. Borrower authorizes Lender, to the extent permitted by applicable law, to charge or setoff all sums owing on the debt against any and all such accounts, and, at Lender's option, to administratively freeze all such accounts to allow Lender to protect Lender's charge and setoff rights provided in this paragraph.

**DEFAULT.** Each of the following shall constitute an Event of Default under this Agreement:

**Payment Default.** Borrower fails to make any payment when due under the Loan.

**Other Defaults.** Borrower fails to comply with or to perform any other term, obligation, covenant or condition contained in this Agreement or in any of the Related Documents or to comply with or to perform any term, obligation, covenant or condition contained in any other agreement between Lender and Borrower.

**Default in Favor of Third Parties.** Borrower or any Grantor defaults under any loan, extension of credit, security agreement, purchase or sales agreement, or any other agreement, in favor of any other creditor or person that may materially affect any of Borrower's or any Grantor's property or Borrower's or any Grantor's ability to repay the Loans or perform their respective obligations under this Agreement or any of the Related Documents.

**False Statements.** Any warranty, representation or statement made or furnished to Lender by Borrower or on Borrower's behalf under this Agreement or the Related Documents is false or misleading in any material respect, either now or at the time made or furnished or becomes false or misleading at any time thereafter.

**Death or Insolvency.** The death of Borrower or the dissolution or termination of Borrower's existence as a going business, the insolvency of Borrower, the appointment of a receiver for any part of Borrower's property, any assignment for the benefit of creditors, any type of creditor workout, or the commencement of any proceeding under any bankruptcy or insolvency laws by or against Borrower.

**Defective Collateralization.** This Agreement or any of the Related Documents ceases to be in full force and effect (including failure of any collateral document to create a valid and perfected security interest or lien) at any time and for any reason.

**Creditor or Forfeiture Proceedings.** Commencement of foreclosure or forfeiture proceedings, whether by judicial proceeding, self-help, repossession or any other method, by any creditor of Borrower or by any governmental agency against any collateral securing the Loan. This includes a garnishment of any of Borrower's accounts, including deposit accounts, with Lender. However, this Event of Default shall not apply if there is a good faith dispute by Borrower as to the validity or reasonableness of the claim which is the basis of the creditor or forfeiture proceeding and if Borrower gives Lender written notice of the creditor or forfeiture proceeding and deposits with Lender monies or a surety bond for the creditor or forfeiture proceeding, in an amount determined by Lender, in its sole discretion, as being an adequate reserve or bond for the dispute.

**Events Affecting Guarantor.** Any of the preceding events occurs with respect to any Guarantor of any of the Indebtedness or any Guarantor dies or becomes incompetent, or revokes or disputes the validity of, or liability under, any Guaranty of the Indebtedness.

**Adverse Change.** A material adverse change occurs in Borrower's financial condition, or Lender believes the prospect of payment or performance of the Loan is impaired.

**Insecurity.** Lender in good faith believes itself insecure.

**Right to Cure.** If any default, other than a default on Indebtedness, is curable and if Borrower or Grantor, as the case may be, has not been given a notice of a similar default within the preceding twelve (12) months, it may be cured if Borrower or Grantor, as the case may be, after receiving written notice from Lender demanding cure of such default: (1) cure the default within ten (10) days; or (2) if the cure requires more than ten (10) days, immediately initiate steps which Lender deems in Lender's sole discretion to be sufficient to cure the default and thereafter continue and complete all reasonable and necessary steps sufficient to produce compliance as soon as reasonably practical.

**EFFECT OF AN EVENT OF DEFAULT.** If any Event of Default shall occur, except where otherwise provided in this Agreement or the Related Documents, all commitments and obligations of Lender under this Agreement or the Related Documents or any other agreement immediately will terminate (including any obligation to make further Loan Advances or disbursements), and, at Lender's option, all Indebtedness immediately will become due and payable, all without notice of any kind to Borrower, except that in the case of an Event of Default of the type described in the "Insolvency" subsection above, such acceleration shall be automatic and not optional. In addition, Lender shall have all the rights and remedies provided in the Related Documents or available at law, in equity, or otherwise. Except as may be prohibited by applicable law, all of Lender's rights and remedies shall be cumulative and may be exercised singularly or concurrently. Election by Lender to pursue any remedy shall not exclude pursuit of any other remedy, and an election to make expenditures or to take action to perform an obligation of Borrower or of any Grantor shall not affect Lender's right to declare a default and to exercise its rights and remedies.

**DEPOSIT ACCOUNT RELATIONSHIP.** Borrower agrees to maintain with Lender a deposit account relationship satisfactory to Lender at all times during the term of the loan.

**MISCELLANEOUS PROVISIONS.** The following miscellaneous provisions are a part of this Agreement:

**Amendments.** This Agreement, together with any Related Documents, constitutes the entire understanding and agreement of the parties as to the matters set forth in this Agreement. No alteration of or amendment to this Agreement shall be effective unless given in writing and signed by the party or parties sought to be charged or bound by the alteration or amendment.

**Attorneys' Fees; Expenses.** Borrower agrees to pay upon demand all of Lender's costs and expenses, including Lender's reasonable attorneys' fees and Lender's legal expenses, incurred in connection with the enforcement of this Agreement. Lender may hire or pay someone else to help enforce this Agreement, and Borrower shall pay the costs and expenses of such enforcement. Costs and expenses include Lender's reasonable attorneys' fees and legal expenses whether or not there is a lawsuit, including reasonable attorneys' fees and legal expenses for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), appeals, and any anticipated post-judgment collection services. Borrower also shall pay all court costs and such additional fees as may be directed by the court.

**Caption Headings.** Caption headings in this Agreement are for convenience purposes only and are not to be used to interpret or define the provisions of this Agreement.

# BUSINESS LOAN AGREEMENT
## (Continued)

**Consent to Loan Participation.** Borrower agrees and consents to Lender's sale or transfer, whether now or later, of one or more participation interests in the Loan to one or more purchasers, whether related or unrelated to Lender. Lender may provide, without any limitation whatsoever, to any one or more purchasers, or potential purchasers, any information or knowledge Lender may have about Borrower or about any other matter relating to the Loan, and Borrower hereby waives any rights to privacy Borrower may have with respect to such matters. Borrower additionally waives any and all notices of sale of participation interests, as well as all notices of any repurchase of such participation interests. Borrower also agrees that the purchasers of any such participation interests will be considered as the absolute owners of such interests in the Loan and will have all the rights granted under the participation agreement or agreements governing the sale of such participation interests. Borrower further waives all rights of offset or counterclaim that it may have now or later against Lender or against any purchaser of such a participation interest and unconditionally agrees that either Lender or such purchaser may enforce Borrower's obligation under the Loan irrespective of the failure or insolvency of any holder of any interest in the Loan. Borrower further agrees that the purchaser of any such participation interests may enforce its interests irrespective of any personal claims or defenses that Borrower may have against Lender.

**Governing Law.** This Agreement will be governed by federal law applicable to Lender and, to the extent not preempted by federal law, the laws of the Commonwealth of Pennsylvania without regard to its conflicts of law provisions. This Agreement has been accepted by Lender in the Commonwealth of Pennsylvania.

**Choice of Venue.** If there is a lawsuit, Borrower agrees upon Lender's request to submit to the jurisdiction of the courts of Montgomery County, Commonwealth of Pennsylvania.

**No Waiver by Lender.** Lender shall not be deemed to have waived any rights under this Agreement unless such waiver is given in writing and signed by Lender. No delay or omission on the part of Lender in exercising any right shall operate as a waiver of such right or any other right. A waiver by Lender of a provision of this Agreement shall not prejudice or constitute a waiver of Lender's right otherwise to demand strict compliance with that provision or any other provision of this Agreement. No prior waiver by Lender, nor any course of dealing between Lender and Borrower, or between Lender and any Grantor, shall constitute a waiver of any of Lender's rights or of any of Borrower's or any Grantor's obligations as to any future transactions. Whenever the consent of Lender is required under this Agreement, the granting of such consent by Lender in any instance shall not constitute continuing consent to subsequent instances where such consent is required and in all cases such consent may be granted or withheld in the sole discretion of Lender.

**Notices.** Unless otherwise provided by applicable law, any notice required to be given under this Agreement shall be given in writing, and shall be effective when actually delivered, when actually received by telefacsimile (unless otherwise required by law), when deposited with a nationally recognized overnight courier, or, if mailed, when deposited in the United States mail, as first class, certified or registered mail postage prepaid, directed to the addresses shown near the beginning of this Agreement. Any party may change its address for notices under this Agreement by giving formal written notice to the other parties, specifying that the purpose of the notice is to change the party's address. For notice purposes, Borrower agrees to keep Lender informed at all times of Borrower's current address. Unless otherwise provided by applicable law, if there is more than one Borrower, any notice given by Lender to any Borrower is deemed to be notice given to all Borrowers.

**Severability.** If a court of competent jurisdiction finds any provision of this Agreement to be illegal, invalid, or unenforceable as to any circumstance, that finding shall not make the offending provision illegal, invalid, or unenforceable as to any other circumstance. If feasible, the offending provision shall be considered modified so that it becomes legal, valid and enforceable. If the offending provision cannot be so modified, it shall be considered deleted from this Agreement. Unless otherwise required by law, the illegality, invalidity, or unenforceability of any provision of this Agreement shall not affect the legality, validity or enforceability of any other provision of this Agreement.

**Successors and Assigns.** All covenants and agreements by or on behalf of Borrower contained in this Agreement or any Related Documents shall bind Borrower's successors and assigns and shall inure to the benefit of Lender and its successors and assigns. Borrower shall not, however, have the right to assign Borrower's rights under this Agreement or any interest therein, without the prior written consent of Lender.

**Survival of Representations and Warranties.** Borrower understands and agrees that in extending Loan Advances, Lender is relying on all representations, warranties, and covenants made by Borrower in this Agreement or in any certificate or other instrument delivered by Borrower to Lender under this Agreement or the Related Documents. Borrower further agrees that regardless of any investigation made by Lender, all such representations, warranties and covenants will survive the extension of Loan Advances and delivery to Lender of the Related Documents, shall be continuing in nature, shall be deemed made and redated by Borrower at the time each Loan Advance is made, and shall remain in full force and effect until such time as Borrower's Indebtedness shall be paid in full, or until this Agreement shall be terminated in the manner provided above, whichever is the last to occur.

**Time is of the Essence.** Time is of the essence in the performance of this Agreement.

**Waive Jury.** All parties to this Agreement hereby waive the right to any jury trial in any action, proceeding, or counterclaim brought by any party against any other party.

**DEFINITIONS.** The following capitalized words and terms shall have the following meanings when used in this Agreement. Unless specifically stated to the contrary, all references to dollar amounts shall mean amounts in lawful money of the United States of America. Words and terms used in the singular shall include the plural, and the plural shall include the singular, as the context may require. Words and terms not otherwise defined in this Agreement shall have the meanings attributed to such terms in the Uniform Commercial Code. Accounting words and terms not otherwise defined in this Agreement shall have the meanings assigned to them in accordance with generally accepted accounting principles as in effect on the date of this Agreement:

**Advance.** The word "Advance" means a disbursement of Loan funds made, or to be made, to Borrower or on Borrower's behalf on a line of credit or multiple advance basis under the terms and conditions of this Agreement.

**Agreement.** The word "Agreement" means this Business Loan Agreement, as this Business Loan Agreement may be amended or modified from time to time, together with all exhibits and schedules attached to this Business Loan Agreement from time to time.

**Borrower.** The word "Borrower" means GEORGE G LEVIN and includes all co-signers and co-makers signing the Note and all their successors and assigns.

**Collateral.** The word "Collateral" means all property and assets granted as collateral security for a Loan, whether real or personal property, whether granted directly or indirectly, whether granted now or in the future, and whether granted in the form of a security interest, mortgage, collateral mortgage, deed of trust, assignment, pledge, crop pledge, chattel mortgage, collateral chattel mortgage, chattel trust, factor's lien, equipment trust, conditional sale, trust receipt, lien, charge, lien or title retention contract, lease or consignment intended as a security device, or any other security or lien interest whatsoever, whether created by law, contract, or otherwise.

**Environmental Laws.** The words "Environmental Laws" mean any and all state, federal and local statutes, regulations and ordinances relating to the protection of human health or the environment, including without limitation the Comprehensive Environmental Response,



## BUSINESS LOAN AGREEMENT
Loan No: 53801078                                    (Continued)                                              Page 6

Compensation, and Liability Act of 1980, as amended, 42 U.S.C. Section 9601, et seq. ("CERCLA"), the Superfund Amendments and Reauthorization Act of 1986, Pub. L. No. 99-499 ("SARA"), the Hazardous Materials Transportation Act, 49 U.S.C. Section 1801, et seq., the Resource Conservation and Recovery Act, 42 U.S.C. Section 6901, et seq., or other applicable state or federal laws, rules, or regulations adopted pursuant thereto.

**Event of Default.** The words "Event of Default" mean any of the events of default set forth in this Agreement in the default section of this Agreement.

**GAAP.** The word "GAAP" means generally accepted accounting principles.

**Grantor.** The word "Grantor" means each and all of the persons or entities granting a Security Interest in any Collateral for the Loan, including without limitation all Borrowers granting such a Security Interest.

**Guarantor.** The word "Guarantor" means any guarantor, surety, or accommodation party of any or all of the Loan.

**Guaranty.** The word "Guaranty" means the guaranty from Guarantor to Lender, including without limitation a guaranty of all or part of the Note.

**Hazardous Substances.** The words "Hazardous Substances" mean materials that, because of their quantity, concentration or physical, chemical or infectious characteristics, may cause or pose a present or potential hazard to human health or the environment when improperly used, treated, stored, disposed of, generated, manufactured, transported or otherwise handled. The words "Hazardous Substances" are used in their very broadest sense and include without limitation any and all hazardous or toxic substances, materials or waste as defined by or listed under the Environmental Laws. The term "Hazardous Substances" also includes, without limitation, petroleum and petroleum by-products or any fraction thereof and asbestos.

**Indebtedness.** The word "Indebtedness" means the indebtedness evidenced by the Note or Related Documents, including all principal and interest together with all other indebtedness and costs and expenses for which Borrower is responsible under this Agreement or under any of the Related Documents.

**Lender.** The word "Lender" means NOVA Bank, its successors and assigns.

**Loan.** The word "Loan" means any and all loans and financial accommodations from Lender to Borrower whether now or hereafter existing, and however evidenced, including without limitation those loans and financial accommodations described herein or described on any exhibit or schedule attached to this Agreement from time to time.

**Note.** The word "Note" means the Note executed by GEORGE G LEVIN in the principal amount of \$5,000,000.00 dated June 30, 2009, together with all renewals of, extensions of, modifications of, refinancings of, consolidations of, and substitutions for the note or credit agreement.

**Permitted Liens.** The words "Permitted Liens" mean (1) liens and security interests securing Indebtedness owed by Borrower to Lender; (2) liens for taxes, assessments, or similar charges either not yet due or being contested in good faith; (3) liens of materialmen, mechanics, warehousemen, or carriers, or other like liens arising in the ordinary course of business and securing obligations which are not yet delinquent; (4) purchase money liens or purchase money security interests upon or in any property acquired or held by Borrower in the ordinary course of business to secure indebtedness outstanding on the date of this Agreement or permitted to be incurred under the paragraph of this Agreement titled "Indebtedness and Liens"; (5) liens and security interests which, as of the date of this Agreement, have been disclosed to and approved by the Lender in writing; and (6) those liens and security interests which in the aggregate constitute an immaterial and insignificant monetary amount with respect to the net value of Borrower's assets.

**Related Documents.** The words "Related Documents" mean all promissory notes, credit agreements, loan agreements, environmental agreements, guaranties, security agreements, mortgages, deeds of trust, security deeds, collateral mortgages, and all other instruments, agreements and documents, whether now or hereafter existing, executed in connection with the Loan.

**Security Agreement.** The words "Security Agreement" mean and include without limitation any agreements, promises, covenants, arrangements, understandings or other agreements, whether created by law, contract, or otherwise, evidencing, governing, representing, or creating a Security Interest.

**Security Interest.** The words "Security Interest" mean, without limitation, any and all types of collateral security, present and future, whether in the form of a lien, charge, encumbrance, mortgage, deed of trust, security deed, assignment, pledge, crop pledge, chattel mortgage, collateral chattel mortgage, chattel trust, factor's lien, equipment trust, conditional sale, trust receipt, lien or title retention contract, lease or consignment intended as a security device, or any other security or lien interest whatsoever whether created by law, contract, or otherwise.

BORROWER ACKNOWLEDGES HAVING READ ALL THE PROVISIONS OF THIS BUSINESS LOAN AGREEMENT AND BORROWER AGREES TO ITS TERMS. THIS BUSINESS LOAN AGREEMENT IS DATED JUNE 30, 2009.

THIS AGREEMENT IS GIVEN UNDER SEAL AND IT IS INTENDED THAT THIS AGREEMENT IS AND SHALL CONSTITUTE AND HAVE THE EFFECT OF A SEALED INSTRUMENT ACCORDING TO LAW.

BORROWER:

X _____(Seal)
GEORGE G LEVIN

LENDER:

NOVA BANK

By: _____(Seal)
Thomas J. Patterson, Senior Vice President

F:\N8774-1074\Loan Docs\Security Agr.doc

## SECURITY AGREEMENT

**THIS SECURITY AGREEMENT** (this "Agreement") is made this _14_ day of April ,
2010, by and between **GEORGE G. LEVIN**, an individual ("Grantor"), with an address at 100 Bay
Colony Lane, Fort Lauderdale, FL 33308 and **NOVA BANK** (the "Bank"), with an address at 1235
Westlakes Drive, Suite 420, Berwyn, PA 19312.

Under the terms hereof, the Bank desires to obtain and the Grantor desires to grant the Bank
security for all of the Obligations (as hereinafter defined).

**NOW, THEREFORE,** the Grantor and the Bank, intending to be legally bound, hereby
agree as follows:

1. <u>**Definitions.**</u>

(a)    "**Collateral**" shall mean and include all of Grantor's right, title and interest in
and to the following personal property, all whether now owned or hereafter acquired or arising, to
wit: the Promissory Note dated as of December 31, 2009 in the original principal amount of
$10,000,000.00 executed by Madison House, LP, a limited partnership ("Madison"), in favor of
Grantor (collectively, the "Note") and all renewals, replacements, amendments and modifications to
the Note and all cash and non-cash proceeds of all of the foregoing property, all products thereof, and
all additions and accessions thereto, substitutions therefor and replacements thereof.

(b)    "**Loan Documents**" means this Agreement, any and the notes evidencing the
Obligations and all related documents, instruments and agreements.

(c)    "**Obligations**" shall include, without limitation, all loans, advances, debts,
liabilities, obligations, covenants and duties owing to the Bank from the Grantor of any kind or
nature, present or future, evidenced by any note, guaranty or other instrument, whether arising by
reason of an extension of credit, opening of a letter of credit, loan or guarantee or in any other
manner, whether arising out of overdrafts on deposit or other accounts or electronic funds transfers
(whether through automatic clearing houses or otherwise) or out of the Bank's non-receipt of or
inability to collect funds or otherwise not being made whole in connection with depository transfer
check or other similar arrangements, whether direct or indirect (including those acquired by
assignment or participation), absolute or contingent, joint or several, due or to become due, now
existing or hereafter arising, and any amendments, extensions, renewals or increases and all costs and
expenses of the Bank incurred in the documentation, negotiation, modification, enforcement,
collection or otherwise in connection with any of the foregoing, including but not limited to
reasonable attorneys' fees and expenses. Notwithstanding the provisions of this subparagraph,
Obligations shall not include any loan, debt or obligation pursuant to a Consumer Loan Transaction
as defined in the Federal Truth-in-Lending Act and Regulation Z promulgated thereunder.

1

PENGAD 800-631-6989    EXHIBIT    3

(d)    "**UCC**" means the Uniform Commercial Code, as adopted and enacted and as in effect from time to time in the Commonwealth of Pennsylvania. Terms used herein which are defined in the UCC and not otherwise defined herein shall have the respective meanings ascribed to such terms in the UCC.

2.    **Grant of Security Interest.** To secure the Obligations, the Grantor, as debtor, hereby assigns and grants to the Bank, as secured party, a continuing lien on and security interest in the Collateral. The Grantor shall deliver the original Note to the Bank.

3.    **Change in Name or Locations.** The Grantor hereby agrees that if the residence of the Grantor changes, the Grantor will immediately notify the Bank in writing.

4.    **Representations and Warranties.** The Grantor represents, warrants and covenants to the Bank that: (a) the Grantor has rights in or the power to transfer the Collateral; (b) the Grantor's state of residence, and the exact legal name of the Grantor are set forth in the introductory paragraph of this Agreement; (c) the Grantor has not made any prior sale, pledge, encumbrance, assignment or other disposition of any of the Collateral and the same are free from all encumbrances and rights of setoff of any kind; (d) the Grantor will not hereafter without the prior written consent of the Bank sell, pledge, encumber, assign or otherwise dispose of any of the Collateral or permit any right of setoff, lien or security interest to exist thereon except to the Bank; (e) the Grantor will defend the Collateral against all claims and demands of all persons at any time claiming the same or any interest therein; (f) the Note is genuine and enforceable in accordance with their terms and the Grantor will defend the same against all claims, demands, setoffs and counterclaims at any time asserted; (g) the Note is not in default and are not subject to any setoff, defense or counterclaim; (h) the execution and delivery of the Note has been duly authorized by all necessary organizational action of Madison and does not violate any of the provisions of its limited partnership agreement or other organizational documents; (i) the Note has not been amended; (j) the principal amount of the Note has been advanced by the Grantor and there is no requirement for any future advances under the Note, (k) the original principal amount of the Note is due and owing and (l) the grantor makes no representation as to the present or future financial condition of Madison, and no representation as to Madison's ability to pay the note at maturity.

5.    **Grantor's Covenants.** The Grantor covenants that it shall:

(a)    The Grantor shall do, obtain, make, execute and deliver all such additional and further acts, things, deeds, assurances and instruments as the Bank may require to vest in and assure to the Bank its rights hereunder and in or to the Collateral, and the proceeds thereof, and

(b)    Immediately notify the Bank of any event causing a default under the Note.

6.    **Negative Pledge; No Transfer.** The Bank does not authorize and the Grantor will not sell or offer to sell or otherwise transfer or grant or suffer the imposition of a lien or security interest upon the Collateral.

2

7.    **Additional Covenants for Note.**

(a)    The Grantor will execute an Allonge to the Note providing that the Note will be payable to the order of the Bank, with full recourse to Grantor.

(b)    Upon the occurrence of an Event of Default and with notice to the Grantor, the Bank may notify Madison or any successor or assignor thereof of the assignment of the Note to the Bank and may direct Madison to make payment directly to the Bank of the amounts due and enforce Grantor's rights against Madison, including demanding payment under the Note. At the request of the Bank, the Grantor will direct Madison to make payment directly to the Bank.

8.    **Perfection of Security Interests.** Grantor authorizes the Bank to execute and/or file one or more financing, continuation or amendment statements pursuant to the Uniform Commercial Code in form satisfactory to the Bank. A carbon, photographic or other copy of this Agreement or of a UCC-1 financing statement may be filed as and in lieu of a UCC-1 financing statement. The Grantor shall deliver the original Note to the Bank.

9.    **Events of Default.** The Grantor shall, at the option of the Bank, be in default under this Agreement upon the happening of any of the following events or conditions (each, an "Event of Default"): (a) any Event of Default (as defined in any of the Obligations); (b) any default under any of the Obligations that does not have a defined set of "Events of Default" and the lapse of any notice or cure period provided in such Obligations with respect to such default; (c) demand by the Bank under any of the Obligations that have a demand feature; (d) the failure by the Grantor to perform any of its obligations under this Agreement; (e) falsity, inaccuracy or material breach by the Grantor of any written warranty, representation or statement made or furnished to the Bank by or on behalf of the Grantor; (f) the entry of any lien against or the making of any levy, seizure or attachment of or on the Collateral; (g) the failure of the Bank to have a perfected first priority security interest in the Collateral.

10.    **Remedies.** Upon the occurrence of any such Event of Default and at any time thereafter, the Bank may declare all Obligations secured hereby immediately due and payable and shall have, in addition to any remedies provided herein or by any applicable law or in equity, all the remedies of a secured party under the Uniform Commercial Code. As permitted by such Code, the Bank will give the Grantor reasonable notice of the time and place of any public sale thereof or of the time after which any private sale or any other intended disposition thereof is to be made. The requirements of commercially reasonable notice shall be met if such notice is sent to the Grantor at least five (5) days before the time of the intended sale or disposition. Expenses of retaking, holding, preparing for sale, selling or the like shall include the Bank's reasonable attorney's fees and legal expenses, incurred or expended by the Bank to enforce any payment due it under this Agreement either as against the Grantor, or in the prosecution or defense of any action, or concerning any matter growing out of or connection with the subject matter of this Agreement and the Collateral pledged hereunder.

3

**11.     Power of Attorney.** The Grantor docs hereby make, constitute and appoint any officer or agent of the Bank as the Grantor's true and lawful attorney-in-fact to sign and/or file, for the Grantor, UCC-1 financing statements and UCC-3 Statements of Change. The Grantor hereby ratifies all that said attorney shall lawfully do or cause to be done by virtue hereof.

**12.     Payment of Expenses.** At its option, the Bank may discharge taxes, liens, security interests or such other encumbrances as may attach to the Collateral, as determined by the Bank to be necessary. The Grantor will reimburse the Bank on demand for any payment so made or any expense incurred by the Bank pursuant to the foregoing authorization, and the Collateral also will secure any advances or payments so made or expenses so incurred by the Bank.

**13.     Notices.**    All notices, demands, requests, consents, approvals and other communications required or permitted hereunder must be in writing and will be effective upon receipt if delivered personally to such party, or if sent by facsimile transmission with confirmation of delivery, or by nationally recognized overnight courier service, to the address set forth above or to such other address as any party may give to the other in writing for such purpose.

**14.     Preservation of Rights.** No delay or omission on the part of the Bank or Grantor to exercise any right or power arising hereunder will impair any such right or power or be considered a waiver of any such right or power or any acquiescence therein, nor will the action or inaction of the Bank or Grantor impair any right or power arising hereunder. The parties' rights and remedies hereunder are cumulative and not exclusive of any other rights or remedies which the Bank or Grantor may have under other agreements, at law or in equity.

**15.     Illegality.** In case any one or more of the provisions contained in this Agreement should be invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of the remaining provisions contained herein shall not in any way be affected or impaired thereby.

**16.     Changes in Writing.** No modification, amendment or waiver of any provision of this Agreement nor consent to any departure therefrom, will in any event be effective unless the same is in writing and signed by the other party, and then such waiver or consent shall be effective only in the specific instance and for the purpose for which given. No notice to or demand on the Grantor in any case will entitle the Grantor to any other or further notice or demand in the same, similar or other circumstance.

**17.     Entire Agreement.** This Agreement (including the documents and instruments referred to herein) constitutes the entire agreement and supersedes all other prior agreements and understandings, both written and oral, between the parties with respect to the subject matter hereof.

**18.     Counterparts.** This Agreement may be signed in any number of counterpart copies and by the parties hereto on separate counterparts, but all such copies shall constitute one and the same instrument.

4

19.    **Successors and Assigns.** This Agreement will be binding upon and inure to the benefit of the Grantor and the Bank and their respective heirs, executors, administrators, successors and assigns; provided, however, that neither the Bank nor the Grantor may assign this Agreement in whole or in part without the prior written consent of the other.

20.    **Interpretation.** In this Agreement, unless the Bank and the Grantor otherwise agree in writing, the singular includes the plural and the plural the singular; words importing any gender include the other genders; references to statutes are to be construed as including all statutory provisions consolidating, amending or replacing the statute referred to; the word "or" shall be deemed to include "and/or", the words "including", "includes" and "include" shall be deemed to be followed by the words "without limitation"; references to articles, sections (or subdivisions of sections) or exhibits are to those of this Agreement unless otherwise indicated. Section headings in this Agreement are included for convenience of reference only and shall not constitute a part of this Agreement for any other purpose. If this Agreement is executed by more than one Grantor, the obligations of such persons or entities will be joint and several.

21.    **Governing Law and Jurisdiction.** This Agreement has been delivered to and accepted by the Bank and will be deemed to be made in the Commonwealth of Pennsylvania where the Bank is located. THIS AGREEMENT WILL BE INTERPRETED AND THE RIGHTS AND LIABILITIES OF THE PARTIES HERETO DETERMINED IN ACCORDANCE WITH THE LAWS OF THE COMMONWEALTH OF PENNSYLVANIA EXCEPT TO THE EXTENT THAT THE UCC PROVIDES FOR THE APPLICATION OF THE LAW OF ANOTHER STATE WITH RESPECT TO THE PERFECTION AND EFFECT OF PERFECTIONS OF THE SECURITY INTERESTS GRANTED HEREUNDER. The Grantor hereby irrevocably consents to the exclusive jurisdiction of the Court of Common Pleas of Chester County, Pennsylvania, and consents that all service of process be sent by nationally recognized overnight courier service directed to the Grantor at the Grantor's address set forth herein and service so made will be deemed to be completed on the business day after deposit with such courier; provided that nothing contained in this Agreement will prevent the Bank from bringing any action, enforcing any award or judgment or exercising any rights against the Grantor individually, against any security or against any property of the Grantor within any other county, state or other foreign or domestic jurisdiction. The Bank and the Grantor agree that the venue provided above is the most convenient forum for both the Bank and the Grantor. The Grantor waives any objection to venue and any objection based on a more convenient forum in any action instituted under this Agreement.

22.    **WAIVER OF JURY TRIAL.** EACH OF THE GRANTOR AND THE BANK IRREVOCABLY WAIVES ANY AND ALL RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY ACTION, PROCEEDING OR CLAIM OF ANY NATURE RELATING TO THIS AGREEMENT, ANY DOCUMENTS EXECUTED IN CONNECTION WITH THIS AGREEMENT OR ANY TRANSACTION CONTEMPLATED IN ANY OF SUCH DOCUMENTS. THE GRANTOR AND THE BANK ACKNOWLEDGE THAT THE FOREGOING WAIVER IS KNOWING AND VOLUNTARY.

WITNESS the due execution hereof as a document under seal, as of the date first written above.

**WITNESS:**

_____(SEAL)

George G. Levin

**NOVA BANK**

By: _____

Thomas J. Patterson, Senior Vice President

6

STATE OF FLORIDA             :

                                       :      SS

COUNTY OF BROWARD           :

      On this, the 14~ day of ~~March~~ APRIL, 2010, before me, the undersigned subscriber, a notary public of the above State, personally appeared George G. Levin, known or satisfactorily proven to me to be the person whose name appears above, and in due form of law he acknowledged execution and delivery of the within Security Agreement to be his voluntary act and deed.

      Witness my hand and official seal the day and year aforesaid.

                               _____
                               Notary Public

NOTARY PUBLIC-STATE OF FLORIDA
Paul McMahon
Commission # DD725606
Expires:   FEB. 10, 2012
BONDED THRU ATLANTIC BONDING CO., INC.

## ALLONGE TO DEMAND PROMISSORY NOTE

**PAYOR:**             MADISON HOUSE, LP, a limited partnership

**PAYEE:**             GEORGE G. LEVIN

**DATE OF NOTE:**      AS OF DECEMBER 31, 2009

**ORIGINAL
PRINCIPAL AMOUNT:**   $10,000,000.00

     This Allonge shall be and remain attached to and shall constitute an integral part of the above-described Demand Promissory Note from and after the date hereof.

     Pay to the Order of NOVA Bank, with full recourse to Payee.

     **IN WITNESS WHEREOF,** the undersigned has executed this Allonge on the _____ day of April, 2010.

**WITNESS:**

_____        _____ (SEAL)
                                              George G. Levin

STATE OF FLORIDA                        :

                                   :        SS

COUNTY OF BROWARD                        :

     On this, the ____ day of ~~March~~ April, 2010, before me, the undersigned subscriber, a notary public of the above State, personally appeared George G. Levin, known or satisfactorily proven to me to be the person whose name appears above, and in due form of law he acknowledged execution and delivery of the within Allonge to Demand Promissory Note to be his voluntary act and deed.

     Witness my hand and official seal the day and year aforesaid.

                                   _____
                                   Notary Public

NOTARY PUBLIC-STATE OF FLORIDA
Paul McMahon
Commission #DD725606
Expires:   FEB. 10, 2012
BONDED THRU ATLANTIC BONDING CO., INC.

# TERM PROMISSORY NOTE

**$10,000,000.00**

**Ft. Lauderdale, Florida**
**As of December 31,**
**2009**

FOR VALUE RECEIVED, the undersigned, MADISON HOUSE, LP, a limited partnership, with an address of 100 Bay Colony Lane, Ft. Lauderdale, FL 33308 (the "Borrower"), hereby unconditionally promises to pay **ON MARCH 31, 2013** to the order of George G. Levin, an individual, with an address of 100 Bay Colony Lane, Ft. Lauderdale, Florida, (together with its successors and assigns, the "Lender") to such account of the Lender, as Lender may designate, the principal amount of TEN MILLION AND NO/100 DOLLARS ($10,000,000.00).   Borrower acknowledges that said sum is due as of December 31, 2009, pursuant to the terms of a cash flow agreement between Lender and Borrower.

The principal amount of this Note, together with all accrued interest thereon and all other sums due and owing by Borrower to Lender hereunder, are herein referred to as the "Loan".

If the entire amount of any required principal and/or interest payment required hereunder is not paid on the date when due, Borrower shall, to the extent permitted by law, pay Lender a late fee of 5%% of the required payment.   Any such late fee assessed shall be immediately due and payable.

Interest on this Note shall accrue at a rate of eight per cent per annum. Interest on the principal amount of this Note shall be calculated on the basis of the actual number of days elapsed over a year consisting of 360 days.

All payments shall be made by Borrower to Lender at 100 Bay Colony Lane, Ft. Lauderdale, Florida, or such other place as Lender may from time to time specify in writing in lawful currency of the United States of America in immediately available funds, without counterclaim or setoff and free and clear of, and without any deduction or withholding for, any taxes or other payments.

This Note may not be modified, amended, waived, extended, changed, discharged or terminated orally or by any act or failure to act on the part of Borrower or Lender, but only by an agreement in writing signed by the party against whom enforcement of any modification, amendment, waiver, extension, change, discharge or termination is sought.   Whenever used, the singular number shall include the plural, the plural the singular, and the words "Lender" and "Borrower" shall include their respective successors, assigns, heirs, executors and administrators.

Borrower and all others who may become liable for the payment of all or any part of the indebtedness hereunder do hereby severally waive presentment and demand for payment, notice of dishonor, protest, notice of protest, notice of nonpayment, notice of intent to accelerate the maturity hereof and of acceleration. No release of any security for the indebtedness hereunder or any person liable for payment of the indebtedness hereunder, no extension of time for payment of this note or any installment hereof, and no alteration, amendment or waiver of any provision of any Loan Document made by agreement between Lender and any other person or party shall release, modify, amend, waive, extend, change, discharge, terminate or affect the liability of Borrower, and any other person or party who may become liable under the Loan Documents for the payment of all or any part of the indebtedness hereunder.

Borrower (and the undersigned representative of Borrower, if any) represents that Borrower has full power, authority and legal right to execute, deliver and perform its obligations pursuant to this note and the other Loan Documents and that this note and the other Loan Documents constitute valid and binding obligations of Borrower.

All notices or other communications required or permitted to be given pursuant hereto shall be given to the parties at their respective addresses as provided herein.

**THIS NOTE SHALL BE GOVERNED BY, AND CONSTRUED AND INTERPRETED IN ACCORDANCE WITH, THE LAW OF THE STATE OF FLORIDA, WITHOUT REGARD TO THE CONFLICTS OF LAW PRINCIPLES THEREOF.**

The Borrower consents that any legal action or proceeding arising hereunder may be brought in any jurisdiction within the State of Florida and assents and submits to personal jurisdiction of any such court in any action or proceeding involving the Borrower or this note.

**THE MAKER HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES TRIAL BY JURY IN ANY LEGAL ACTION OR PROCEEDING RELATING TO THIS NOTE OR ANY OTHER LOAN DOCUMENT AND FOR ANY COUNTERCLAIM THEREIN.**

The Lender shall have the right to assign, in whole or in part, this Note, and any other Loan Document and all of its rights hereunder and there under, and all of

-2-

the provisions herein and therein shall continue to apply to the Loan.   The Lender shall have the right to participate the Loan with other parties.

The Lender shall not, by any act, delay, omission or otherwise be deemed to have waived any of its rights or remedies hereunder and no waiver by the Lender of its rights or remedies hereunder shall be valid against the Lender unless in writing, signed by the Lender, and then only to the extent therein set forth.   The waiver by the Lender of any right or remedy hereunder upon any one occasion shall not be construed as a bar to any right or remedy which it would otherwise have had on any future occasion.

The liability of the undersigned shall be absolute and unconditional and without regard to the liability of any other party hereto.

NEWYORK01 1276179v2 042211-000004

IN WITNESS WHEREOF, Borrower has caused this Note to be executed and delivered as of the day first above written.

MADISON HOUSE, L.P., a limited partnership, by

Atlantic Coast Group, Inc., as the General Partner.

George G. Levin, as President of Atlantic Coast Group, Inc., a corporation, the General Partner.

STATE OF FLORIDA                    )  ) SS:COUNTY OF BROWARD        )

On the 14th day of APRIL, in the year 2010, before me, the undersigned, personally appeared George G. Levin, as President of Atlantic Coast Group, Inc., General Partner of MADISON HOUSE, L.P., personally known to me or proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is(are) subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their capacity, and that by his/her/their signature(s) on the instrument, the individual(s) or the person(s) upon behalf of which the individual(s) acted, executed the instrument.

                                    NOTARY PUBLIC[Seal]

NOTARY PUBLIC-STATE OF FLORIDA
Paul McMahon
Commission #DD725606
Expires:   FEB. 10, 2012
BONDED THRU ATLANTIC BONDING CO., INC.

Signature Page

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**FT. LAUDERDALE DIVISION**
**www.flsb.uscourts.gov**

In re:

                                          **Case No.: 10-33696-RBR**
                                          **Chapter 7 Proceeding**

**GEORGE LEVIN,**

        **Debtor.**

_____/

### AFFIDAVIT OF INDEBTEDNESS

STATE OF PENNSYLVANIA       )
                                )SS
COUNTY OF PHILADELPHIA    )

        BEFORE ME, the undersigned authority, duly authorized to take acknowledgments and administer oaths in the State and County aforesaid, personally appeared Michael Cosden, who after being duly sworn on oath, deposes and says:

        1.     I am over the eighteen (18) years of age and I am Vice President – Special Assets Manager for NOVA Bank.

        2.     This Affidavit is based upon facts of which I have personal knowledge and from a review of the business records maintained by NOVA Bank in its ordinary course of business. NOVA Bank regularly maintains such business records in the ordinary course of business and the entries to those records were made by agents of NOVA Bank contemporaneously with the events reflected therein.

        3.     As part of my duties at NOVA Bank, I am familiar with NOVA Bank's maintenance of its records in the ordinary course of business regarding the loan relationship between NOVA Bank, as lender, and George Levin, as borrower.

**EXHIBIT**

4

PENGAD 800-631-6989

4.    On June 30, 2009, George Levin executed and delivered to NOVA Bank, a Promissory Note in the principal amount of $5,000,000.00. A true and accurate copy of the Promissory Note is attached to Nova Bank's Motion for Relief From the Automatic Stay ("Stay Relief Motion") as **Exhibit 1**.

5.    On June 30, 2009, George Levin also executed a Business Loan Agreement. A true and accurate copy of the Business Loan Agreement is attached to the Stay Relief Motion as **Exhibit 2**.

6.    On April 14, 2010, as security for the Obligations by George Levin, George Levin executed and delivered to NOVA Bank, a Security Agreement, which provided NOVA Bank with a security interest in all of Levin's:

> right, title and interest in and to the following personal property, all whether now owned or hereafter acquired or arising, to wit: the Promissory Note dated as of December 31, 2009 in the original principal amount of $10,000,000.00 executed by Madison House, LP, a limited partnership ("Madison"), in favor of [Levin] (collectively, the "Note") and all renewals, replacements, amendments and modifications to the Note and all cash and non-cash proceeds of all of the foregoing property, all products thereof, and all additions and accessions thereto, substitutions therefor and replacements thereof

(the "Property"). A true and accurate copy of the Security Agreement is attached to the Stay Relief Motion as **Exhibit 3**.

7.    NOVA Bank is presently the owner and holder of the Promissory Note, Business Loan Agreement, and Security Agreement (collectively, the "Loan Documents") and is entitled to all of the rights and remedies provided for therein.

8.    George Levin defaulted under the Promissory Note by failing to make all payments required by the Promissory Note. Thereafter, the principal balance on the Promissory

Note, together with accrued and unpaid interest, became due and owing on July 1, 2010, the maturity date.

9.      Levin failed to pay the principal balance under the Promissory Note, together with accrued and unpaid interest on the maturity date.

10.     To date, NOVA Bank has not received full payment under the Loan Documents.

11.     Pursuant to the Loan Documents, the following sums were due and owing to NOVA Bank as of August 12, 2010:

| | |
|---|---|
| Principal | $4,999,027.78 |
| Interest @ 5% (through 8/12/10) | $   62,904.80 |
| Accrued Late Charges | $     7,998.51 |
| **Total as of August 12, 2010** | **$ 5,069,931.09** |

12.     Interest continues to accrue at the daily rate of $694.31, and other charges and advances may be incurred by NOVA Bank including, but not limited to: attorneys' fees and costs for which George Levin is responsible.

FURTHER AFFIANT SAYETH NAUGHT.

Michael Cosden,  Vice-President  –  Special
Assets Manager of Nova Bank

STATE OF ___Pennsylvania___
COUNTY OF ___Philadelphia___

The foregoing instrument was acknowledged before me this 29 day of October 2010, by Michael Cosden, Vice-President – Special Assets Manager of Nova Bank, who is personally known to me or who produced ___license___ as identification.

Notary Public, State of ___Pennsylvania___

Printed Name: ___Jami Bozzuto___

Notary Commission No. ___

My Commission expires ___

NOTARIAL SEAL
JAMI M BOZZUTO
Notary Public
PHILADELPHIA CITY, PHILADELPHIA COUNTY
My Commission Expires Feb 5, 2012

WPI 344864v1 10/29/10



**Fox Rothschild** LLP
ATTORNEYS AT LAW

2000 Market Street, 20th Floor
Philadelphia, PA 19103-3222
Tel 215.299.2000  Fax 215.299.2150
www.foxrothschild.com

**Brett A. Berman**
Telephone: (215) 299-2842
Telecopier: (215) 299-2150
Internet Address:  bberman@foxrothschild.com

August 19, 2010

***Via Federal Express and First Class Mail***

George G. Levin
100 Bay Colony Lane
Ft. Lauderdale, FL  33308

      Re:    **Promissory Note for Benefit of Nova Bank**

Dear Mr. Levin:

      Please be advised that this Firm is counsel for NOVA Bank (the "Bank").  In that capacity, I have been advised that you are in default under the Promissory Note dated June 30, 2009 (Loan # 53801078) in the original principal amount of $5,000,000.00 and related documents (collectively the "Loan Documents") due to, *inter alia*, your failure to remit the following payments to the Bank timely:

      Past due amounts:
      6/1/10 loan interest i/a/o $12,220.13
      7/1/10 loan interest i/a/o $20,829.34
      7/1/10 loan principal i/a/o $4,999,027.78, plus accrued late charges, inclusive of 5.0% of
      delinquent loan principal balance

      Moreover, beyond being in default under the terms of the Loan Documents for failure to pay the monthly loan payments described above, the Loan Documents had a maturity date of July 1, 2010.

      As a result of the above defaults and as the Loan Documents had a maturity date of July 1, 2010, the Bank is now entitled to exercise and enforce its rights and remedies under the Loan Documents and applicable laws.  As such, the Bank demands that you tender payment to the Bank of the outstanding payments owed to the Bank under the Loan Documents, including interest, fees, costs and expenses, in immediately available funds within ten (10) days of the date of this letter.

      Please contact me directly if you have any questions regarding this letter.

A Pennsylvania Limited Liability Partnership

California    Connecticut    Delaware    Florida    Nevada    New Jersey    New York    Penn



EXHIBIT

5



**Fox Rothschild** LLP
ATTORNEYS AT LAW



George G. Levin
August 19, 2010
Page 2 of 2

       Nothing contained in this letter nor any action or inaction by the Bank shall constitute an election of remedies or an agreement to forebear on the part of the Bank, nor shall anything contained herein constitute a waiver of any defaults existing on the Loan Documents or a waiver of any of the Bank's rights or remedies under the Loan Documents or applicable law or otherwise. Furthermore, the acceptance of payments by the Bank under or in connection with the Loan Documents shall not constitute an election of remedies or agreement to forebear on the part of the Bank.

Very truly yours,

Brett A. Berman

cc:

*Via First Class Mail and E-mail*
Michael Cosden, Vice President – Special Assets Manager
NOVA Bank
30 Elm Avenue
Woodbury Heights, NJ 08097

Michael G. Menkowitz, Esquire



 **Prudential**

**Fox & Roach,**
**REALTORS®**
COMMERCIAL DIVISION

**PAUL STRIEFSKY**
**Broker-Salesperson**
**Commercial Director**
Office:  609-407-6427
Cell:  609-226-0061
paul.striefsky@prufoxroach.com

October 5, 2010

Mr. Michael Viscount, Jr.
1301 Atlantic Avenue, Suite 400
Atlantic City, NJ 08401

Re: **Broker's Price Opinion Madison House**
     **125 S. Dr. Martin Luther King Blvd**
     **Atlantic City, NJ 08401**

Dear Mr. Viscount

Both *Prudential Fox & Roach, Realtors, The Trident Group, LLC,* and I would like to thank you for contacting us to assist you in analyzing the asset known as the Madison House located in Atlantic City, NJ. The purpose of this Broker Price Opinion, (BPO), is to provide an estimate of value of the property in its present condition and use and also as land value to a developer.

**Madison House Hotel:** Originally built in the late 1920's, the Madison House opened in 1930 during the Great Depression and was considered one of the best hotels in Atlantic City for the remainder of the 20th Century... The hotel is a 14 story brick structure with approximately 210 rooms ranging from your typical twin bed hotel room to its unique junior suites. In 2000 the hotel became an extension to the Sands Casino for guest hotel use through a lease/management agreement until 2006 when the Sands closed.  As part of the purchase agreement, the new owners, Pinnacle Entertainment, inherited the lease that the Sands Casino had with the owners of the hotel.

**Property Location:** The subject property is located at 125 S. Martin Luther King Boulevard just off of Pacific Avenue, across from the former Sands Casino which was acquired in 2006 for $270 million and demolished by the Pinnacle Casino in 2007. The hotel sits on a lot measuring 105 X 151 feet and is approximately 750 feet from the world famous Atlantic City Boardwalk, a ½ mile from the Atlantic City Expressway and 4 miles to the Garden State Parkway.  The Atlantic City International Airport is approximately 8 miles to the northwest.

**Zoning: RS-C Resort Commercial District:** The site is located in the RS-C Zone which is intended to apply to established resort areas in the city. Its purpose is to provide for the city's main industry; casinos, and consisting predominantly of transient and tourist oriented uses. Residential development is also encouraged for the purpose of preserving and enhancing the family-resort character of the city and integrating the specialized activities of the Resort Commercial District with rest of the community.  More specific information can be determined by reviewing the Atlantic City Municipal Land Use ordinances.

**Page 1 of 3**

 **1001 Tilton Road  Northfield, New Jersey  08225**
**(Office) 609-641-0011**



EXHIBIT
6
PENGAD 800-631-6989

**Market Values:**

Market Values are determined by the supply and demand of properties and what a willing buyer would pay for said property in today's market. Below you will find the estimated values based on different marketing scenarios. In evaluating these scenarios, one must take into account the time value of money along with the risk associated with each of them:

1. **"AS IS" Sale:** Since the lot size would require variances and other land use approvals, the land itself would only be of value to someone that is assembling parcels to build a larger project. The other options would be to refurbish the rooms to operate it again as a hotel, or convert the rooms into condominiums or time-share units. An "as is" sale would entail a buyer purchasing the property in its current condition and use and therefore assuming any risk of changing the properties use to suit his needs. Sales of hotels, motels, rooming houses in Atlantic City and surrounding areas are generally based on income derived from the property. With the subject property having been closed since 2006 the only other cost method to use would that of price per unit/room. Based on recent sales and the present condition of the subject property, the value of the property would be between $15,000.00 to $20,000.00 per room or $3,150,000.00 to $4,200,000.00

2. **Condominium Ownership:** This approach would maximize the value of a property if one had the luxury of time and additional capital to convert the rooms into condominiums. The challenge with this option, as with other properties in the resort, is the available of parking. In addition the cost of the approvals to convert the units into condominiums, one has to factor in the refurbishing and carrying cost of the project. An example of this type of conversion is the Park Lane building next door. Although completed, this project has met with the same financial and housing market slump as the rest of the country with no sales in its initial marketing of the units that range from $69,000.00 for efficiencies to $250,000.00 for 2 Bedroom units on the top floor. In speaking with the owner, he is looking to either sell the project off to another investor or time-share operator. If the present owners of the Madison House were to either partner up with a developer or work out an arrangement where the developer would carry the project and pay back the owners for their participation upon unit sales, then value of each unit cost would increase to $25,000.00 to $30,000.00 per room or $5,250,000.00 to $6,300,000.00

3. **Subsidized or Public Housing:** Given the present state of the economy; local, state and federal, this property may be able to be used as temporary/long term shelter for public housing. This would enable an investor or the present owners/creditors to create cash flow to carry the debt on the property, provide needed temporary housing, and allow time for the real estate market conditions to improve to sell for a higher price as a later date. Once up and operating as a public housing unit, the asset will surely increase in value. This use may even allow the buyer/creditors to apply for and receive substantial tax credits through the state and/or federal government. Presently room rates for this type of housing range from $150.00 to $200.00 per week.

Although there may be other possibilities or options to sell this property, we believe the above options offer the best choices in disposing of this asset in the quickest time period or one of the quickest ways to increase its value.

**Page 2 of 3**



**1001 Tilton Road  Northfield,  New Jersey  08225**
**(Office) 609-641-0011**



**Conclusions:**

Due to the present market conditions, either an outright sale; whether through traditional marketing or the use of a public auction, or obtaining an operating agreement with local, state or federal housing agencies would be the best options to maximize the value of this property.

**Disclosure:**

It should be noted that no one from *Prudential Fox & Roach Realtors, The Trident Group, LLC.,* is a licensed engineer, planner, appraiser, or architect, and the above calculations, projections, and proposed values are only estimates based on the present market conditions in and around Atlantic City. This study should not be mistaken for what can or can not be built or used on this property. A more detailed and precise assessment should be obtained from a New Jersey licensed architect/engineer/planner, and further discussed with a New Jersey licensed attorney who specializes in Land Use Law and is familiar with the internal procedures of Atlantic City government, Zoning and Planning Boards as well as the Code Construction officials.

**Qualifications:**

Paul Striefsky has been a licensed since 1984 and a Broker-Salesperson since 1988. He has served as a member of the City of Somers Zoning Board of Adjustment for 19 years and has sat as a member of the Planning Board since 2006 and has been Chairman of that board since 2009. Mr. Striefsky also is and has been a Director on the Atlantic City and County Board of Realtors since 1992 and is a Director for the South Jersey Regional MLS since 2008.

In closing, we would like to thank you again for giving *Prudential Fox & Roach Realtors, The Trident Group, LLC.,* the opportunity to service your real estate needs. All research, documents, and reports used for this report and be furnished upon request. If we can be of any further assistance, please do not hesitate to contact us.

Sincerely,

_____

**Paul Striefsky, Broker-Salesperson**

**cc: file**





**Page 3 of 3**


